CABELL, .1.
I concur in the opinion just delivered, and in the decree which is to be entered; but, so far as charges the executors, I own, with much reluctance. For I am quite sure, that they have acted with the utmost good faith, and that they were betrayed into the excess of payments to some of the legatees, over and above their just proportion, by a delusion as to the value of the subject on which the legacies were charged, not peculiar to themselves, but as universal at the time, as it has proved to have been great.
Tucker, P.
It cannot be denied, that the principal question in this case, is one of the deepest interest and importance. It is worthy of the diligent research and great ability which have been devoted to the discussion of it, and will justify the enlarged view which may be found necessary in the decision: T mean the question as to the charities.
It is contended, on the one hand, that these several bequests are void and ineffectual, for uncertainty as to the beneficiaries who are to take under them : and, on the other, that they are good as bequests to charitable purposes, which the law will support, and which the court of chancery, upon the general principles of its equitable jurisdiction, will enforce at the instance of the attorney general.
There is no principle supposed to be more perfectly settled in reference to conveyances, than that every deed must have sufficient certainty as to the grantee who is to take under it. If there be such uncertainty as to the grantee, that it cannot be known distinctly who is to take by the grant, it is ipso facto void, for that uncertainty. This, it would seem to me, was not merely a principle of common law, but the dictate of common sense; and hence this defect is equally fatal, whoever may be the grantor; for it is a defect, not of power in him, but growing out of the utter impossibility of effectuating the grant, by reason of the un *466 defined character of the grantee. The absurdity of such a Srant cannot be better exposed, than by an attention .to its operation in this very case, if it could be supposed to be valid. It is obvious, that the bequest here, though for building a church, is a bequest to the roman catholic congregation in Richmond; and it is equally obvious that the testator designed no individual benefit to the members of that congregation : yet, as the society or congregation isnot incorporated, it may well be asked, who are to be regarded as the beneficiaries entitled to the advantage of this bequest ? Who can present himself as a claimant of this aid designed for the roman catholic religion ? If membership of the congregation is to be the test of right, then the title will be in a continual state of flux. What belongs to A. today, will by his removal from, Richmond, or apostacy/mra the church, cease to be his tomorrow; whereas B. by removal to the city, or conversion to the church, might, by the converse of the principle, acquire tomorrow, a right which he has not today. Moreover, who would be the legally constituted triers of the fact of conversion or apostacy, whereby one man is to gain, or another is to lose, the interest in the property ? Who, indeed, constitute the society ? W7hom does the law recognize, or the testator designate, as having the power to decide this essential question ? Are all who have been baptized in the church, within the operation of the will? or those only who are received as partakers of its most solemn ordinances ? These, and a multitude of like difficulties, present themselves to the notion of any grant or conveyance to a religious society, or to trustees for their use. For, in the eye of the law, the intervention of a trustee does not remove a single difficulty. There is not more necessity for a properly defined grantee, in a deed, than for a cestui que trust capable of taking, and so defined and pointed out, that the trust will not be void for uncertainty. In short, there cannot be a trust without a cestui que trust; and if it cannot be ascertained who the cestui que trust is, it is the same thing as if there was none.
*467 These principles, it is confidently believed, are the general principles of the common law upon this subject. If there are exceptions to these principles, those exceptions may without doubt be shewn. A diligent search has led , , , , , me to the conviction, that there was no case at common law, in which a bequest or a trust of this indefinite character, could be supported; and the learned counsel on both sides, have acknowledged, that they have been unable to any case anteriour to the statute 43 Elizabeth, in which the validity of such bequests or trusts has been distinctly recognized by the courts. It ought, therefore, perhaps, to suffice to rest the argument here; since, if under the general principle the bequest would be void, it is incumbent upon those who claim to be protected by an exception, to establish that exception. Accordingly, it is contended, that gifts for charitable uses, furnish an exception : and when it is answered, that indefinite charities received their whole force and efficacy from the statute 43 Elizabeth, it is confidently replied, that charities existed, and were recognized by law, anteriour to that statute ; that the statute itself affords evidence of the fact; that it ought not to be regarded as an enabling statute, or as creative of an original power not before existing, but as affording new and additional facilities for the administration of charities of a particular description. It is, indeed, further contended, that, by the common law, the king, as parens patria?, had the genera] superintendence of all charities, which he exercised by the keeper of his conscience the lord chancellor; that, whenever it was necessary, the attorney general, at the relation of some informant,* filed an information in the court of chancery, to have the charity established; that the exercise of this jurisdiction by that court, was by virtue of its general judicial functions, and of its extraordinary equitable jurisdiction, which has been transferred to the courts of equity in Virginia; that this autho *468 rity, of the king, as parens patries, is inherent in all governments, and therefore vested in this; that it embraces the protection of infants, lunatics and idiots, and the execution of charities; and that this inherent authority is devolved upon the courts of chancery in Virginia, the nature of whose jurisdiction and powers are peculiarly, adapted to its judicious and faithful exercise. In this general, and, I own, very imperfect view of the outlines of the argument for the charities, it is sufficiently obvious that there are many grave and important questions involved. A hasty review of some of them, however, must suffice here^-
That charitable gifts were known and recognized by the law anteriour to the statute of Elizabeth, it is not necessary to deny. It is not doubted, that many charitable gifts were so known and recognized. Charitable gifts for meritorious purposes, not within the statutes of mortmain, were doubtless held good and enforced, where the beneficiary or grantee was a person, whether natural or artificial, capable to take. Thus, a bequest to a corporation capable to take, is and always was valid as a charitable gift. So, in England, a bequest to the church of such a parish, was a good bequest to the parson and his successors; because the parson is a corporation sole, capable to take; But it behoves those who contend for the existence of an exception to the general rule, which reprobates indefinite bequests, to shew, that indefinite charities as well as those where the beneficiary was certain and defined, were sustained anteriour to the statute 43 Elizabeth. To do this, resort is had to the language of the statute itself. From that language I draw the opposite inference; the grounds of which I shall presently state. At present, I will remark, that various dicta have been quoted, in which very conflicting opinions have been expressed, as to the existence of recognized charities of this description, anteriour to the statute of charitable uses. Among these dicta, stands, I think, pre-eminent, the opinion of chief justice Marshall, it) the case of The Baptist association v. Hart's ex’ors. That opinion is entitled to no less weight *469 than the great authorities of lord keeper Henley and lord Macclesfield, if wo look to the intelligence of the source from which it flowed; and to much greater, when it is remarked, that their opinions were incidentally expressed, upon a matter of no consequence in the english tribunals, but vital to the question which was so ably investigated by the chief justice. No opinion can be more entitled to the respect and consideration of this court. It is not indeed authoritative, whether it was strictly upon the point on which that case ultimately turned, or not. And even though it were extrajudicial, yet it was so carefully weighed, and so cautiously made up, as to entitle it to much more consideration than many a decision hastily pronounced upon the very matter in question. I do not, however, consider it as extrajudicial. The question discussed fairly arose, and was properly decided, after having been laboriously examined ; and the case is conclusive of this, so far as any decision of that tribunal can influence a decision here. The devise was not more indefinite than this devise; it was, like this, for religious purposes ; and it was pronounced void for its uncertainty. 1 refer to it, therefore, as presenting a much stronger argument than any I can offer, in support of the position, that these indefinite bequests for charitable purposes, could only be sustained under the statute 43 Elizabeth. Let us, however, look to the language of that statute ourselves, and see what inference is fairly to be deduced from -it.
It recites, that “ Whereas lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, and stocks of money, have been heretofore given, limited, appointed, and assigned, as well by the queen’s most excellent majesty, and her most noble progenitors, as by sundry other well disposed persons; some for relief of aged, impotent and poor people ; some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools and scholars in universities; some for repair of bridges, ports, havens, causeways, churches, sea banks, and highways; some *470 for education and preferment of orphans; some for or to-war(js relief, stock or maintenance, for houses of correction; some for marriages of poor maids; some for supportation, aid and helps of young tradesmen, handicraftsmen, and perdecayed 5 and others for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants, concerning payments of fifteens, setting out of soldiers, and other taxes; which lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money and stocks of money, nevertheless, have not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust and negligence, in those that should pay, deliver and employ the same; for redress and remedy whereof, Be it enacted” &c. It would seem, then, that previous to this statute, there had been various instances of charitable donations, which had not been carried into execution, by reason of the frauds, breaches of trust and negligence, of the trustees. And this being the evil, what was the remedy to be applied ? That depended precisely upon the state of the law and jurisprudence of the country at the time. If the law had provided a remedy for the evil; if there was a tribunal open to the injured for their redress ; if, as is clear, all beneficiaries whose interest was’ definite and certain, might enforce their own rights before the ordinary tribunals; and if, as is supposed, in the case of vague and uncertain charities, the king, as parens patries, was bound to interfere, through his attorney general, for their protection; then, the defect was not in the law, but in the execution of the law. Instead of passing a new law, constituting a new tribunal, to enforce what the ordinary tribunals were fully adequate to enforce, if such vague legacies were good at all, all that was necessary, was, to stimulate the diligence of the attorney general, and other officers of the crown, to enforce these charities, in the manner now pursued in the chancery of England. This must be particularly obvious in relation to the queen’s own charities, which, like others, were negligently and fraudulently admin- • *471 istered. To suppose that the queen’s own charities would not have been enforced, if the doors of her own chancery were open to enforce such charities as these, would be, I think, a groundless conjecture. It is far more reasonable to conclude, that, as these vague dispositions were certainly against the general principles of the common law, this new . , , c . . ’ .... statute was enacted tor the purpose of giving them validity, and enforcing them, by a scheme, clumsy enough, it must be admitted, and therefore affording strong evidence that the commodious remedy in equity was unknown, but yet obviously designed for that purpose, as I shall presently shew.
.But though we cannot account for the statute of charitable uses, upon the supposition, that there was a remedy for indefinite charities, yet is the statute very easily explained upon the contrary supposition. The common law, whose system of rules was often technical and unbending, recognized the validity of no gift or bequest, where the beneficiary was not ascertained, and could not be ascertained by any thing upon the face of the instrument itself. Yet, in process of time, the impulses of charity, the spirit of superstition, a devoted zeal for the public interest, and the pride of adding one’s name as patron to great public institutions, doubtless gave rise to many attempts to convey or settle estates to such purposes. The character of queen Elizabeth very naturally impelled her to build up and sustain these benevolent establishments of the well disposed, how uncongenial soever they might be to the rules of the common law. But this rule of the common law was founded on the intrinsic difficulty, that, as the grantee or beneficiary was uncertain, it was impossible that any person could present himself in a court of justice, upon the ordinary principles of the common law, with any claims to the execution of the charity in his behalf. This was the mischief. The remedy was, to create a commission whose duty it should be £i to inquire, as well by the oaths of twelve lawful men as by all other lawful ways and means, of all such gifts, limitations, appointments ike. and of the abuses, breaches of *472 trusts, negligences &c. in respect to them ;” “ and upon suc^ ^n(lu*lTj hearing and examination thereof, to set down [i. e. make] such orders, judgements and decrees, as that the said lands &c. may be duly and faithfully employed, to for such of the charitable uses, and intents (before rehearsed) for which they were given.” These commissioners published a general notice to the parish, calling upon all per-gr'eved to come forward with their complaints; and, under their very general powers, they heard the complaint of any person coming within the description of the beneficiaries however general; Duke, p. 10. They then issued a writ to the sheriff, commanding him to summon a jury, who made an inquest finding the facts. The party interested was summoned and heard; and then the commissioners decreed. They had power to remedy the defects of assurances, and where they were uncertain, to give them certainty, as far as possible; Id. 28. 109. 113.114. Even where void at law, they could make them good; Id. 78. 79. 80. 81. 119. And when the objects were general, they decreed feoffments and other assurances to be made, and renewed from time to time, to keep up the number of feoffees for the charitable use; Id. 63. 67. By these proceedings, the two obstacles to the execution of these charities, were removed— 1. The want of a certain beneficiary, who might call upon the trustees to fulfil the trust, was remedied by appointing as many several commissioners throughout the kingdom, as the chancellor of England, or the chancellor of the duchy of Lancaster, might think necessary, in their respective jurisdictions, whose ex officio duty it should be to inquire into such breaches of trust. 2. After inquiry, the respective' commissions were authorized “ to make such orders, judgements and decrees as that the said lands may be duly and faithfully employed” fac. This clause without question gave, and was intended to give, a full power to the commissioners (subject to the correction) of the chancellor, to render that certain by their orders and decrees, which before was indefinite and vague. It clothed them with authority to give *473 the direction to the charity of the donor; to fix upon and prescribe the course of its administration; to compel its execution in favour of the object pointed out, if one was so dcsignated, though still too vague to he held good at common law; and, where no object was distinctly declared, to make such a scheme of the charity, as might he nearest the avowed wishes of the donor or testator. In this clause, as interpreted, we find, I think, the germ of the principle of administering charities cy pres, and, indeed, of the various other principles now prevailing in the courts; principles (particularly the cy pres principle) which are utterly without foundation in reason or justice, unless they can be traced to some imperative command, or ample authority Conferred by parliament itself. Does it not strike the most common understanding as an invasion of right, to give an estate which is devised to a roman catholic charity, to a charity of the church of England, on the principle, that the first was void at law, and the next is cy pres the testator’s intention, when nothing in the world could have been farther from his intention? In the case for instance, of the Attorney General v. Baxter, 1 Vern. 248. A. by will, gave £ GOO. to JVIr. Baxter, to be distributed among sixty ejected ministers, and £20. to be laid out in his book, entitled Baxter’s Call to the unconverted. lie and the sixty poor ejected ministers were non-conformists, and for that reason, most probably, the objects of the testator’s bounty. Yet, because they were non-conformists, the use was declared void as to them; but it was said, that the money being given for religious charity, must be disposed of in charity, and that this being intended for ejected ministers, ought to go amongst the clergy; whereupon it was decreed to go to maintain a chaplain (a conformist) in Chelsea hospital. And this upon the doctrine of cy pres, though it is obvious that the non-conforming testator never could have intended such a disposition of his estate. Though this decision was reversed, it shews the spirit in which the statute was administered. Such extravagant pretensions in the courts, can only be accounted for *474 upon the idea already suggested, that the broad powers conferred by the statute of Elizabeth, laid the foundation of this jurisdiction, which otherwise would have been an unauthorized invasion of private right.
Before I pass from these views of the subject, it may be proper to remark, as the foundation for a conclusion hereafter to be drawn, that the broad and comprehensive lan_ guage of this statute, gives reason to believe, that, if there was any common law doctrine about indefinite charities, that doctrine was completely covered by the provisions of the statute. For, it was not a mere act organizing an inquisitorial commission, but its provisions were construed, and rightly construed, to give validity to charitable bequests, which were held void at the common law. 1 Ch. Ca. 134. 195. Hob. 136. Finch, 221. Ch. Ca. 267.
Having thus deduced from the statute of charitable uses, that before its enactment, indefinite legacies were not considered as susceptible of being enforced, though for charitable objects, it may next be observed, that the scanty cases to be found in the early reporters, afford no ground for a contrary opinion. It is obvious, indeed, from Porter’s case, 1 Co. 23. that the ingenuity of professional men had been taxed to invent some mode of making good these charitable bequests. In that case, Gibson devised real estate to his wife, upon condition that she should grant it for the maintenance of a free school and of certain alms-men and women. Instead of so applying it, she leased it for forty years. The heir entered for the condition broken, and conveyed to the queen. The court was of opinion, that the condition was broken, and the entry of the heir lawful. Here, then, seems to have been a case as late as the 34th of Elizabeth, in which, instead of seeking to enforce this charitable trust, by a bill in chancery at the instance of the attorney general, the awkward expedient was resorted to, of conveying to the queen, who, I presume, was to see to the distribution of the charity. For, it is justly remarked by chief justice Marshall, that, in that case, “ no question arose concerning *475 the possibility of enforcing the execution of the trust. It was not forbidden by law, and therefore the trustees might execute it. On failing so to do, the condition was broken, and the heir might enter; but it is not suggested, that the cestui que trust had any remedy.” After the entry of the heir, there was clearly none; for the entry for the condition broken, utterly defeated the estate; and the trust which grew out of it, if it was ever available, was defeated also. “ In the argument of Porter’s case” (says the chief justice) “ the only mode suggested for insuring the school the benefit intended, was by an act of incorporation and a letter of licence.” And I intirely concur with him in the opinion, that upon reading this caso, which was conducted by lord Coke and other able counsel, it is impossible to resist the conviction, that the court of chancery had not, at that time, the power to afford a remedy for such indefinite trusts. It was, indeed, impossible it should. There was no individual beneficiary, who could have presented himself before the court, and identified himself as the person intended to take under the will. Nor could the attorney general, at that day, have instituted proceedings for the purpose of enforcing the charity; for not only is there no instance of any such proceeding, I think, hut, even after the statute, it was held that no bill could be filed by the attorney general at the relation of an individual, unless for a charity under the statute; 2 Vern. 387. If, then, no individual could sue, claiming to be the identical beneficiary, and if the attorney general could not sue by relation, it is difficult to imagine what suit could have been instituted, before the statute, to enforce the charity. Indeed, from a view of all the cases, I incline to think that the agency of the attorney general arose after the statute. Certain it is I can find no information ariteriour to it.
Upon the whole, I am well satisfied, that the whole of the doctrine of the english courts in reference to indefinite charities, springs from the statute of 43 Elizabeth, which is not in force in Virginia. Whether that statute ever was in *476 force here, has been made a question in the cause. I incline to think it may have been, at least according to the construction which was given to it, and which considered it , . . ........ -not as merely constituting a commission lor inquiring into breaches of charitable trusts, but as greatly enlarging, if not as opening an intirely new field for the exercise of benevo- , v , . J, . . ... lence. 1 hough local in its provisions in some respects, it was general its operation in others. If it ever was in force, however, it was repealed in the year 1792, in the general repeal of english statutes. That repeal was no rash or unadvised act. By an act of the session of 1789, ch. 9. followed by the act of 1790, ch. 20. a commission, consisting of six gentlemen of the most distinguished acquirements, was appointed, whose duty was, among other things, “ to prepare bills upon the subject of such english statutes, if any there were, which were suited to this commonwealth, and had not been enacted in the form of Virginia laws.” The committee of re visors proceeded to the discharge of the duty confided to it, and the result was the act of 1792, by which all english statutes then in force, were declared to be repealed ; the legislature reciting that, at that session, it had specially enacted such of them as appeared worthy of adoption. The repeal of this statute must, therefore, be looked upon as an advised act of legislation, and-in the same light as if it had been specially repealed by its title.
I have already taken occasion to remark, that, if there were any recognized charities of an indefinite character at common law, the broad language of the statute of Elizabeth comprehended them. In so far as it did comprehend them, it reduced only to the form of a statute, what was law before the statute; and our legislature, in repealing it, must be regarded as having repealed not its mere naked words, but the principle which they involved. Although, therefore, it should be admitted that certain indefinite charities were recognized at common law, yet as the statute also comprehended them, and was itself repealed, the common law was repealed eodemfiatu with the statute. In this aspect of the *477 case, it is unnecessary to decide, whether, if an english statute prior to tile 4 James I. which repealed the common law, be itself repealed, the common law is thereby revived ; notwithstanding the provision 1 Rev. Code, ch. 41. § 2. and notwithstanding the common law principle so repealed, was not at the settlement of the colony, nor ever since, the law ot yirgtnia.
If I have been correct in this course of argument, there' can be no pretence for the enforcing of the charities under this will of Mr. Gallego, as they were void at common law, and arc not entitled to the protection of the statute of the 43 Elizabeth. Be this as it may, I must have argued to little purpose, and chief justice Marshall must for once have been also singularly unfortunate, if what has been said has not at least shewn, that it is a matter of very serious doubt, whether the power to enforce charities ever did exist independent of the statute, if it be a matter even of doubt, to what conclusion must we come? 1 am deliberately of opinion, that in that case, a just respect to the policy of the legislature, in relation to religious charities especially ; a prudent caution on our part, in assuming doubtful powers; a due sense of the infinite difficulty and embarrassment, which must attend the search after the common law doctrines anteriour to the statute of Elizabeth; and a just view of the danger of reviving those obsolete doctrines;—must determine us to leave the subject to the wisdom of the legislature itself. A few remarks on these topics, will close this part of my opinion.
No man at all acquainted with the course of legislation in Virginia, can doubt, for a moment, the decided hostility of the legislative power to religious incorporations. Its jealousy of the possible interference of religious establishments in matters of government, if they were permitted to accumulate large possessions, as the church has been prone to do elsewhere, is doubtless at the bottom of this feeling. The legislature knows, as was remarked by the counsel, that wealth is power. Hence, the provision in the bill of rights; *478 hence, the solemn protest of the act on the subject of religious freedom; hence, the repeal of the act incorporating the episcopal church, and of that other "act which invested the trustees appointed by religious societies with power to manage their property : hence too, in part, the law for the sale of the glebe lands: hence the tenacity with which ap- ,. . .6 . . . J r plications for permission to take property in a corporate character (even the necessary ground for churches and graveyards) have been refused. The legislature seems to have been fearful, that the grant of any privilege, however trivial, might serve but as an entering wedge to greater demands. Nor did this apprehension of the dangers of ecclesiastical establishments, spring up for the first time with our republican institutions. The history of ages had attested the proneness of such establishments to vast accumulations of property, and the statute book of England is loaded with statutes of mortmain, which were rendered necessary by the rapacity of the clergy, at least in the early periods of the church. So long as there have been church establishments, with power to receive and accumulate property, so long has the tendency to such accumulation been manifested distinctly. The history of the papal see, and of the religious houses under its dominion, is but a history of the cupidity of monks and devotees, yeiled under the sacred garb of our holy religion. The vast domains of the clergy acquired by the catholic establishment of France, are known to us all. From this fatal source, among others, sprung a revolution, which deluged the fairest country in Europe in blood, and, in its horrible progress, spread desolation over adjoining states, and shook the civilized world to its centre. And in protestant England, fenced around as it has been with mortmain acts, we see a church establishment possessed of overgrown wealth and power, less devoted to the cause of genuine religion, than to pamper the luxury and indolence of the high dignitaries of the church. With these examples before our eyes,' it is hot wonderful that our statesmen have been cautious. They have been wise in their caution. The *479 evil has not sprung from particular creeds, or the peculiari- * ^ 1 ties of a confession of faith. It grows out of the very nature of the thing. The church, if made capable to take, while it is continually acquiring, from the liberality of the pious, or the fears of the timid, or the credulity of the ignorant, never can part with any thing; and thus, like those sustaining powers in mechanics, which retain whatever they once have gained, it advances with a step that never retrogrades. The natural cupidity of the human heart, is watched by the devotee himself, with the less jealousy in his pursuit after acquisitions for the church, since he believes it to be purified from the dross of selfishness, and sanctified by the holy object of his ambition. Thus it is, that however humble in its beginning, accumulation is the natural result of the power vested in any religious society to acquire property. The same influence which enables it to gain from the state its first insignificant privileges, will secure to it, from time to time, new though apparently inconsiderable accessions; until, at last, the power will be acquired which legislative jealousy has apprehended. Property, indeed, it need not ask of the legislature. The power to take and accumulate, alone, is necessary: all time has shewn, that the influence of feelings of devotion will do the rest. I speak of those feelings which exist without any undue influence from the pastor of the society. But, if we go farther, and suppose it possible, that those abuses which once have existed, may exist again, the progress will be more rapid, though not more certain. “ What (says the accomplished sir Samuel Romilly) is the authority of a guardian, or even of a parent, compared with the power of religious impressions under the ascendancy of a spiritual adviser, with such an engine to work upon the passions ; to inspire (as the object may be best promoted) despair or confidence; to alarm the conscience by the horrors of eternal misery, or support the drooping spirits, by unfolding the prospect of happiness which is never to end.”
*480 Such, I conceive, are the general grounds, upon which , . . , . ,. , . . r rests the legislative policy, in relation to the power ot acquiring and holding property by religious societies. We have seen, too, a similar policy evinced as to charities gene-in striking at the root of them all, by the repeal of the statute of Elizabeth. It is not (to use the language of one of the counsel) that charity is banished from Virginia. Its benign and salutary influence may warm and animate every heart, and lead to a generous munificence, as the daily habit of our lives, without exposing the state to the evils which have always flowed from what are called conveyances in mortmain. It is not necessary here to detail those evils. But it is relevant to observe, that conveyances in mortmain to corporations, were not more calculated to produce a pernicious locking up of property, than charitable bequests of this indefinite character. A corporation may be dissolved, and the property may be again taken up into the general circulation, by reverting to the donor. But these charities never die. There is no means of putting an end to them in the lapse of ages; for according to this celebrated doctrine of cy pres, if the original object should fail, the attorney general and the master in chancery go to work to digest another scheme, cy pres the original intention of the donor. Such was the case with the charity to William Mary college. Experience has justified these complaints, and accordingly about one hundred years ago, the parliamént of G. Britain found itself compelled to pass the statute 9 George 2. which, in important particulars, repeals the statute of 43 Elizabeth. It is at this moment, when the country whose laws we have adopted, has partly receded from the wretched policy of permitting the whole property of society to be swallowed up in the insatiable gulph of public charities, that we are called upon to reanimate the pernicious principle, which they now deprecate, and which with us has been sleeping in inaction, for nearly two centuries and an half. And this too, when we have put off the panoply of the mortmain acts, by the general repeal of them in 1792. *481 It is said, indeed, that the legislature may pass the necessary laws for regulating these charitable gifts, and thus prevent the evils that might flow from the unlimited permission of them. But I think, under the existing doubts which hang around the subject, and after the lapse of centuries, during which the law respecting charities, if it ever existed here, has been silent and quiescent, it behoves the judiciary to leave to the legislature, the duty of waking it into life.
This leads me to remark, lastly, that the occasion calls for a prudent caution on the part of the judiciary in the assumption of this jurisdiction. We have already seen, that no cases are to be found, no guide is afforded, as to the course pursued by courts of equity in respect to charities anteriour to the statute of Elizabeth, if they ever took cognizance of them. But it is said, that the king as parens pa-trice, from the earliest times had the power to' superintend and enforce charities: that this power was exercised by him through the lord chancellor, the keeper of his conscience : that it was so exercised, not under a specially delegated authority, but by virtue of his general judicial functions or extraordinary jurisdiction in matters of equity: that this authority of the parens patria, is inherent in all governments, and therefore in this; and is devolved upon the court of chancery here, whose jurisdiction is general over all matters in chancery, and is peculiarly adapted to the judicious administration of the law of charities. I shall content myself with referring to the conclusive argument of the chief justice, 4 Wheat. 47. for the position, that the jurisdiction of the chancellor of England over charities, is a branch of the prerogative, and not a part of the ordinary powers of the chancery court, in the exercise of its equitable jurisdiction. The authorities to which he refers are intirely satisfactory upon the point. If this be so, it is sufficiently obvious, that the act which established the court of chancery in Virginia, cannot have transferred to that court this branch of the prerogative. The powers conferred by that act are judicial in their character, and not such as belonged *482 to the chancellor of England, as the keeper of the consci- . . ' . » enceof the Icing, as representing his person, and administering, as his agent, his prerogatives and duties. Admitting then, as we well may, the superintending power of the crown, asy?apatria, over charities, and admitting that this power is inherent in the sovereignty, I will ask upon what ground shall we arrogate it to the judicial branch of the government? That there inheres in every sovereign power, a right and a duty to protect those who have no other protector, as infants and lunatics, cannot be denied : and that there is an inherent power also in the sovereign, to declare that vague and indefinite charities shall be administered, if, in its wisdom, it shall so decree, is equally undeniable. But it remains to be proved, that this power is judicial, and not legislative: it remains to be proved, that the flowers of royal prerogative, which have fallen from the crown of England, have devolved upon the chancellors here. In this government of prescribed and limited powers, no public functionary, no organ of the sovereign power, no department, can assume a power which is not to be found in the law or the constitution. They constitute the commission under which alone authority can be duly exercised. It was in this view, very truly said, that this branch of the royal prerogative, if it had not been withered by the repeal of the statute, would have devolved upon the legislature. That body is the parens patria, under our system, and it would have remained for it to point out the organ which should administer its important function. My own opinion is, decidedly, that it does not now belong to the judiciary, even if it has existence any where in relation to charities. They must first be established, to call this guardian power into existence; and I have endeavoured to shew, that there is nothing, now recognized by law in relation to charities, upon which it can operate; for definite charities are but trusts which equity will execute by virtue of its ordinary jurisdiction, and with which, even in England, the attorney general cannot interfere ; and indefinite charities are not recognized by law, *483 and cannot therefore be enforced, either with or without his aid.
The result of this view of the subject is, that the interJ locutory order of the chancellor must be reversed, and the bill of the attorney general dismissed.
It is now necessary to advert to the other questions arising in these cases. The chancellor held, 1. that the twenty-six enumerated legacies in the will, and the pecuniary in the several codicils, stood upon the same footing, and in case of deficiency should abate in proportion : and 2. that there was nothing in the will to justify the executors, in paying the whole of any of these legacies to any legatee, to the prejudice of other legatees; and the estate having eventually proved insufficient to pay all, the unpaid legatees are entitled to resort to the executors themselves for their duo proportions, and cannot be turned round to demand from the other legatees to refund. Upon these points I concur with the chancellor.
1. As to the first: general or pecuniary legacies must always abate proportionably. The testator, it is true, may arrange this matter otherwise at his pleasure; for cujus est dare, ejus est disponere. But the order in which legacies are given, affords no evidence of this intention : for, even where the testator intends a perfect equality, some must be given first and some last. Hence the court has, generally, declined laying weight on particular words, as the saying, imprimis, or in the first place, or on a direction as to the time of payment. If it did not, there would be no end to claims of preference, considering the variety of expression, and the incorrectness with which wills are frequently drawn. 2 Ves. 421. 1 Vern. 31.
When, however, a testator creates two residuums of his estate, or in other words, residuum upon residuum; the first to be computed after taking out certain specified legacies; the other to be computed after taking out another set of legacies; the intention of the testator is very clearly shewn, to create different grades in his benefactions. As in this *484 case : the legacy of 50,000 dollars in trust for his Spanish relations and the 15,000 dollars to P. J. Chevallie, and the legacies in the will to the manumitted slaves, making a sum total of 69,600 dollars, are clearly -to be preferred to the °^ler pecuniary legacies bequeathed by the will, and to the various pecuniary legacies in the codicils; while all these in' their turn have preference to those who are'to take the last residuum. The case of Lewin v. Lewin, 2 Ves. 415. is in this respect like this, and the explanation of it by lord Hardwiclce, 2 Ves. 420. in the case of Blower v. Morret, is very applicable.
There is nothing I think in this will to shew, that any of this second class of legatees have preference over others. It was argued, that Mrs. Fisher had preference, not only in point of time, but in point of right; but I do not think the proposition was zealously supported; and it certainly cannot be maintained. The benevolent designs of the testator, in favour of Mrs. Fisher, are indeed very strongly marked; but it cannot be supposed, that, if he had been asked the question, whether, if there was only enough to pay 5000 dollars, she should have the whole, to the exclusion of all the rest of his friends, he would have replied affirmatively. The rule of law, however, requires a proportional abatement in all, instead of a rejection of any; and it is founded, in part perhaps, in the presumption, that, if a testator could foresee that there would not be enough, to pay all his pecuniary legatees, the full amount of what he had given, he would rather have reduced their legacies in equal proportions, than have stricken out any one of them altogether. As to the legacies in the codicils, they certainly stand upon the same footing, by the express arrangement of the will, and upon general and established principles. 2 P. Wins: 24.
2. As to the second point: no blame was imputable, or imputed, to the executors, for postponing as they did, the sales of the testator’s real estate. They acted fairly and honestly. But the executors having imprudently (for it is *485 not pretended they have acted unfairly) paid to various legatees of the second class, the full amount bequeathed to them, and the fund having proved deficient, so that there must be a general abatement among them, two questions arise : 1. To whom are the unpaid legatees to look for their legacies ? And 2. are those who have been paid liable to - , „ , refund at all ?
As to the first, 1 can have no doubt. They have to look to the executors, and to them alone, as they are solvent. If, indeed, they were insolvent, then they might, or might not, have a title to redress from the over-paid legatees, according to the principles which will be presently referred to. But the executors being solvent, there is no pretence for saying, that instead of looking to them, to whom the administration of the fund has been entrusted by the testator and by the law, they must look to those, to whom they have unadvisedly paid it away.
That upon general principles, the legatee has a right to demand payment of his legacy from the executor himself, instead of being turned over to compel legatees to refund who have been paid too much, cannot be denied. It would be a waste of time to cite authority, or to offer reasons, for such a principle. The argument indeed has rather tended to admit it, but to insist upon an exception, arising out of the particular provisions of this will. These provisions are, the direction <! to pay Mrs. Fisher her 5000 dollars, as soon as possible, knowing she is in need,” and this clause; “ with respect to the payment of the different legacies left by my foregoing will or part of my residuary estate, I leave to the judgement of my executors to begin paying those that they may think are most in need.” It is contended, that these clauses justified prompt payment, if the assets were adequate; that the assets were deemed adequate; and that an unforeseen depreciation has occasioned the existing inadequacy.
The cases cited in which executors have been relieved against the charge of devastavit, on the ground of the rc *486 duction of the assets by unforeseen accidents, are not to be questioned. The executor who pays simple contract debts when there were abundant assets, and those assets have been reduced by a general and destructive fire, or by eviction by title paramount which could not be foreseen, is surely entitled to relief. 2 Freeman, 1. 1 Madd. 1. 63. 1 P. Wms. 354. 1 Rand. 421. In Miller v. Rice, 1 Rand. 438. the executor, while the assets were abundant, confessed assets and gave a forthcoming bond, and afterwards, the ’assets becoming deficient by a general depreciation of property, he was relieved, and justly : for he had not voluntarily paid : he was sued : could he have been required or expected >to plead a false plea? When he did plead, he could neither have pleaded plene administravit, norplene administravit prceter, for he had abundant assets. He was bound then to let the judgement go; and if he had not done so, it would have resulted in the same thing. His plea would have been falsified, and judgement entered. When, therefore, he was about to suffer for his promptness and fair dealing, he was relieved, and properly relieved.
In this case, however, the state of things is very different. To justify a departure from the general course of administration,’ the executors ought to shew, that they have done that which, in the execution of this will, with its broad discretion, prudent men ought to have done. On the one hand, they were bound, indeed, as soon as possible on account of her needy circumstances, to have paid Mrs. Fisher her legacy. This was one injunction of the testator. Bat there was another more imperative. It was to pay all the legatees of the second class, either in'the will or codicil, pari passu. It cannot be pretended, that if the deficiency had been foreseen, such payment-would have been good. Now, the executors, ought to have foreseen its possibility at least, and to have guarded against it. Their testator had expressly directed, that the sales should not be hurried, as the time was unfavourable. The depreciation of property had commenced, and might continue. It was impossible to say that *487 the property would pay the large sums charged upon it. What then was to be done, in this state of conflicting duties, of which the superiour was, to secure equality to all. if it was impossible to reconcile them, the subordinate should have given way, and Mrs. Fisher ought not to have been paid : for though she was to be paid as soon as possible, the possibility contemplated was a possibility consistent with the state of things in other respects. It was, in the strict sense, very possible to pay her the day after the testator’s death. But this he did not mean. It was not, however, impossible, to reconcile these conflicting duties. Two obvious modes presented themselves : to require security to refund, which every executor has a right to require from a legatee, whom he pays in advance of other legatees; or, if Mrs. Fisher’s situation did not enable her to give such security (of which there is no evidence) that was itself an additional motive for retaining the principal, and paying her the annual interest; or for vesting the principal in stock for her benefit, but under their control, in case the affairs of the estate should make it necessary to reclaim it. And, if her necessities required an advance of part of the principal, they should cautiously have advanced only so much, as would, under any conceivable state of things, have fallen to her share. In truth, however, there is no evidence, that the W'ants of this good lady would not have been adequately met by a payment of the interest. If her situation was such, I repeat that it was a motive for additional caution; particularly, if, as is contended, other legatees are to be turned around to her, instead of looking to the solvent executors; for they may well say, that the executors had no right to pay over their money to an insolvent person.
The case of Mrs. Fisher is stronger than that of the other legatees who have been overpaid. As to them no observation can be necessary. The executors had no right to pay them in anticipation, to the prejudice of others. They are therefore liable to the plaintiffs for the full amount of their proportions.
*488 The other question proposed, is as to the liability, of the legatees who have been overpaid, to refund. Authorities have been cited to shew, that when an executor has voluntarily paid or assented to a legacy, it is to be taken to be an admission of the sufficiency of the assets, and the legatee will not be compelled to refund; 2 Ves. sr. 194. 1 Rop. on Leg. ch. 9. 2 P. Wms. 296. 1 Eq. Ca. 239. pl. 25. 2 Vern. 225. 1 Bro. C. C. 484. The first of these cases is the strongest of them all, and therefore shall be adverted to, particularly. Now upon examining the opinion of the court, it is evident, that the very great weight attached to the admission of assets there, by the payment of the legacy, arose principally from the particular circumstances of the case. The executor had returned no inventory of the estate, and had paid off all the other legatees. And, even in that case, it is not alleged by sir John Strange, that the presumption is conclusive. If he had so decided, it would have been against the general principle which considers all such presumptions liable to be rebutted. The payment of the full amount of one legacy, furnishes indeed a presumption, and a very strong presumption, that there is enough to pay the rest. But what is there in the nature of the situation and character of an executor, that shall exclude him from this common privilege of repelling by evidence, a presumption of fact against him ? There is nothing. An executor may have paid one by mistake, or he may from kindness to that one, have been willing to run the hazard of deficiency. But these would not be reasons for his being compelled to pay another out of his own pocket. I think, therefore, that the authorities can only be understood as saying, that payment to one affords the strongest presumption of sufficiency to pay the others, but not as denying the right of the executor, in a contest with those others, to rebut that presumption.
The question is more difficult as between the executor and the legatee who has been paid. The cases cited are certainly very strong to shew, that where an executor has *489 made voluntary payments, he shall not recover them back, . . though the assets prove deficient. It is said to be otherwise where the payment is compulsory; 2 Vern. 205. Or the deficiency of assets was created by debts which did not appear till after payment of the legacy. 2 Fonb. Eq. 377. It is admitted, indeed, that though the executor cannot compel the legatee to refund what was overpaid, other legatees may, where the assets were originally deficient, and were bound to abate proportionably. But where the assets were sufficient, but have been wasted by the executor, who has become insolvent, even those who have not received any thing, shall not force him who has, to refund ; for they shall have no advantage of his diligence. Toller’s law of ex’ors, 341. 2 Fonb. Eq. 376. 1. P. Wms. 495. 1 Ves. 194.
Notwithstanding the cases which have been decided, in England, where the executor is entitled to the residuum, that the executor shall not recover back from a legatee, what has been overpaid him, I cannot think, that such is held to be the inflexible law with us. If, indeed, the advances have been long since made, and the estate distributed many years, the executor’s bill to refund would not be entertained. Robertson v. Archer, 5 Rand. 319. But the very ground upon which this case was decided, negatives the general proposition, since the court would scarcely have proceeded upon the narrow principle, if the broad principle had been admitted, Indeed, in the well known case of Burnley v. Lambert, 1 Wash. 312. it had been said by the president of this court, after pronouncing that the executor was the proper judge of the ability of the testator’s estate, “ that after the assent of the executor, the legal property is completely vested in the legatee, and cannot at law be divested by the creditors. That, in such case, the creditors have a double remedy, 1. against the executors at law, in which case the executors have their remedy in equity to compel the legatee to refund; or 2. the creditors” &tc. This opinion is but in unison with the general spirit of our decisions, *490 which have relaxed much of the seventy of ancient adju- .... . . dications, in those cases where no fraud or misconduct is imputed to the executor, in the management of the estate, nor any apparent advantage derived to him from his errors omissions, but he appears to have acted bond fide and ^onest intenti°ns. 2 Call, 86. I am, therefore, in-dined to think, that there is no inflexible rule, which refuses. an executor, under all circumstances, a right to recover back from a legatee, an excess of advancements which may have been made to him above his rateable proportion of his legacy. The executors, in this case, might, therefore, file a cross bill, if they pleased, to have that matter fairly settled.
The cases cited by Mr. Leigh, of Brisbane v. Dacres, 5 Taunt. 114. and Skyring v. Greenwood, 4 Barn. & Cres. 281. 1 Com. Law Rep. 43, 6. and 10 Id. 335, 8. are not, I think, decisive of this case. Sir V. Gibbs says, speaking of the right to recover back money paid by mistake of law, but under full knowledge of the facts, that “ the party submitting to the demand, and paying the money, gives it to the person to whom he pays it, and closes the transaction between them.”—“ He who receives it, has a right to consider it as his, without dispute: he spends it in confidence that it is his : and it would be most mischievous and unjust, if he who has acquiesced in the right by voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter, and recover it back. He who received it, is not in the same condition. He has spent it in the confidence it was his, and, perhaps, has no means of repayment.” In the case of Skyring v. Greenwood, chief justice Abbott expresses the like opinions yet more strongly. But both rely upon the fact, that the party receiving had a right to consider what was paid as his absolutely, and without dispute. But the legatee who has received his whole legacy in advance, is not precisely in this situation. He knows, that no act of the executor can absolve him from refunding at the suit of a creditor; or even at the suit of a legatee, if the executor is insolvent. He does not, there *491 fore, fall within the principle of either of these cases, in this respect; and, certainly, not within the first, for another reason. The mistake hero, is a mistake oí fact, or, if you please, an erroneous inference from facts within the executors’ knowledge; the mistake there, was a mistake as to the law; and where a doubtful question of law arises, if the \ party, who might litigate the right, submits to the demand, be can never recaí the act upon the ground that he has erred. For, otherwise, there never could be a valid compromise upon a point of law; since, in every case, one or other must be wrong.
Upon the whole, I am of opinion to affirm the general principles of the chancellor’s decree, except as to the charities, and to rewand the cause to be proceeded in according to these principles, with some slight modifications as to the details.
The decree entered by this court, reversed the chancellor’s decree as to the charities, and dismissed the attorney general’s hill; and, approving the general principles of the decree, in respect to the other suit brought by the individual legatees, and correcting some of its details, affirmed it in all other respects.

 There is, in fact, no relator in this ease. This is always hold essontial in England, that there may he some one liable for costs. Note, by the judge.